1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   RAYMOND O. AGHAIAN (SBN 218294)
4  MARGARET L. CARTER (SBN 220637)
   MEGHAN A. BLANCO (SBN 238171)
5  Assistant United States Attorneys
        1200/1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone:  (213) 894-6567/7413/2253
        Facsimile:  (213) 894-0141
8       Email:    raymond.aghaian@usdoj.gov
                  maggie.carter@usdoj.gov
9                 meghan.blanco@usdoj.gov

10 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

11

12                  UNITED STATES DISTRICT COURT

13             FOR THE CENTRAL DISTRICT OF CALIFORNIA

14
   UNITED STATES OF AMERICA,     )  No. ED CR 08-128(B)-TJH
15                               )
                  Plaintiff,     )  GOVERNMENT'S SENTENCING REPLY RE:
16                               )  DEFENDANT CONSTANTINE PETER KALLAS;
                  v.             )  DECLARATION OF RAYMOND O. AGHAIAN;
17                               )  EXHIBITS
   CONSTANTINE P. KALLAS, et     )
18 al.,                          )  Sentencing Date: 08/09/10
                                 )  Sentencing Time: 10:00 a.m.
19                  Defendant.   )
                                 )  Courtroom of the
20                               )  Honorable Terry J. Hatter
                                 )
21 _____

22

23      Plaintiff United States of America, through its attorney of

24 record, the United States Attorney for the Central District of

25 California, hereby files the Government's Sentencing Reply in

26 Response to Defendant's Sentencing Position.  The Government's

27 Sentencing Reply and Response is based on the attached

28 Memorandum of Points and Authorities, as well as the attached

1  Declaration of Raymond O. Aghaian and the exhibits thereto; the

2  Government's initial Sentencing Memorandum, filed on July 26,

3  2010; the Presentence Investigation Report; the Addendum to the

4  Presentence Investigation Report, disclosed on August 2, 2010;

5  the files and records in this case, and any evidence and argument

6  that may be presented at any sentencing hearing.

7  DATED: August 3, 2010          Respectfully submitted,

8                                 ANDRÉ BIROTTE JR.
                                   Acting United States Attorney
9
                                   ROBERT E. DUGDALE
10                                 Assistant United States Attorney
                                   Chief, Criminal Division
11

12                                 ___/s/_____
                                   RAYMOND O. AGHAIAN
13                                 Assistant United States Attorney
                                   Cyber & Intellectual Property
14                                 Crimes Section

15                                 Attorneys for Plaintiff
                                   United States of America
16

17

18

19

20

21

22

23

24

25

26

27

28

2

TABLE OF CONTENTS

PAGES

Table of Authorities. . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . .1

I.   INTRODUCTION.. . . . . . . . . . . . . . . . . . . .1

II.  ARGUMENT.. . . . . . . . . . . . . . . . . . . . . .2

     A.   Guidelines Analysis.. . . . . . . . . . . . . .2

          1.   High-Level Decision Making or
               Sensitive Position.. . . . . . . . . . . .3

          2.   Organizer/Leader Role in the Offense.. . . . .5

          3.   Value of Payments Received.. . . . . . . . .9

          4.   More Than One Bribe. . . . . . . . . . . . 10

          5.   Defendant Facilitated Obtaining Documents
               Relating to Immigration Status.. . . . . . 10

          6.   Grouping.. . . . . . . . . . . . . . . . . 11

     B.   Defendant's Arguments for Downward
          Departure/Variance. . . . . . . . . . . . . . 12

          1.   The Government's Recommended Sentence Does Not
               Create Any *Unwarranted* Disparity.. . . . . . 12

          2.   Defendant Should Not Receive a *Lesser*
               Sentence Because He Committed Felonies While
               Employed as a Government Prosecutor. . . . . . 18

          3.   The Court Should Not Impose a Lesser Sentence
               as a Result of Defendant's Mental or Physical
               Health.. . . . . . . . . . . . . . . . . . 21

          4.   Defendant's Family Situation Does Not Warrant a
               More Lenient Sentence. . . . . . . . . . . . 24

     C.   Restitution and Fine. . . . . . . . . . . . . 25

     D.   Request for a Closed Hearing. . . . . . . . . 26

III. CONCLUSION.. . . . . . . . . . . . . . . . . . . . 26

i

TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

PAGES

<u>United States v. Alfonso-Reyes,</u>
    592 F.3d 280 (1st Cir. 2010).. . . . . . . . . . . . . . 7

<u>United States v. Bok,</u>
    156 F.3d 157 (2d Cir. 1998). . . . . . . . . . . . . . 25

<u>United States v. Ferrara,</u>
    384 F. Supp. 2d 384 (D. Mass 2005).. . . . . . . . . . 18

<u>United States v. Irons,</u>
    No. 01-30447, 65 Fed. Appx. 110, 2003 WL 1919379
    (9th Cir. April 18, 2003). . . . . . . . . . . . . . . 18

<u>United States v. Irons,</u>
    Nos. 99-30375, 00-30014, 13 Fed. Appx. 630, 2001 WL 760533
    (9th Cir. Jul. 5, 2001). . . . . . . . . . . . . . . . 18

<u>United States v. Kelley,</u>
    36 F.3d 1118 (D.C. Cir. 1994). . . . . . . . . . . . . 7

<u>United States v. Kapitzke,</u>
    130 F.3d 820 (8th Cir. 1997).. . . . . . . . . . . . . 21

<u>United States v. Koon,</u>
    518 U.S. 81 (1996).. . . . . . . . . . . . . . . 19, 20

<u>United States v. Lee,</u>
    No. 00-10360, D.C. No. CR-98-20117-RMW, Fed. Appx. 744,
    2001 WL 1297698 (9th Cir. Oct. 23, 2001).. . . . . . . 16

<u>United States v. Melbourne,</u>
    No. 02-30238, Fed. Appx. 938, 2003 WL 1506050
    (9th Cir. Mar. 10, 2003).. . . . . . . . . . . . . . . 18

<u>United States v. Saeteurn,</u>
    504 F.3d 1175 (9th Cir. 2007). . . . . . . . . . . . . 13

<u>United States v. Stephenson,</u>
    895 F.2d 867 (2d Cir. 1990). . . . . . . . . . . . . . 5

<u>United States v. Thames,</u>
    214 F.3d 608 (5th Cir. 2000).. . . . . . . . . . . . . 20

<u>United States v. Tzoc-Sierra,</u>
    387 F.3d 978 (9th Cir. 2004).. . . . . . . . . . . 13, 18

ii

TABLE OF AUTHORITIES, con't

PAGES

FEDERAL STATUTES AND REGULATIONS

18 U.S.C. § 1028A.. . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3663A.. . . . . . . . . . . . . . . . . . . 25

28 C.F.R. § 50.9. . . . . . . . . . . . . . . . . . . . 26

UNITED STATES SENTENCING GUIDELINES

U.S.S.G. § 2B1.1. . . . . . . . . . . . . . . . . . . . 9

U.S.S.G. § 2C1.1. . . . . . . . . . . . . . . . . . . passim

U.S.S.G. § 3B1.1. . . . . . . . . . . . . . . . . . 5, 6, 7

U.S.S.G. § 3D1.2. . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 3D1.3. . . . . . . . . . . . . . . . . . 11, 12

U.S.S.G. § 3D1.4. . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. § 5E1.1. . . . . . . . . . . . . . . . . . . . 25

U.S.S.G. § 5H1.3. . . . . . . . . . . . . . . . . . . . 21

U.S.S.G. § 5H1.4. . . . . . . . . . . . . . . . . . . . 21

U.S.S.G. § 5K2.0. . . . . . . . . . . . . . . . . . 21, 22

1            **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3       As set forth in its initial sentencing position, filed on

4 July 26, 2010, the government maintains that the Court should

5 sentence defendant Constantine Peter Kallas ("defendant") at the

6 midpoint of the applicable guidelines range, to a total of 353

7 months imprisonment; a two-year term of supervised release; a

8 mandatory special assessment of $3,600; and a $25,000 low-end

9 guidelines fine.  The government also maintains the Court should

10 order defendant to pay restitution to OWCP in the amount of

11 $296,865.45,[1] and that the Court oblige defendant, as a condition

12 of defendant's supervised release, to pay an additional $83,424

13 in restitution to the IRS.

14       The Court should reject defendant's attempts to whittle down

15 the applicable offense level from the 40 calculated by the

16 probation office and the government.  Defendant's position as an

17 immigration prosecutor for ICE clearly qualifies as a "high-level

18 decision-making or sensitive position" meriting a four-level

19 enhancement under U.S.S.G. § 2C1.1(b)(3).  The four-level

20 enhancement under Chapter 3 for defendant's role as an organizer

21 and leader of the scheme is also warranted because defendant was

22 essentially the mastermind of the criminal scheme and directed

23 virtually every part of it, except for some Spanish-language

24 communications between the aliens and his wife and co-defendant,

25 Maria Gabriela Kallas ("M. Kallas").  The government's loss

26 _____

27       [1]    The Probation Office has recently amended the PSR and
Recommendation Letter to account for the higher level of actual
28 losses sustained by OWCP that defendant reports in Exhibit D to
his initial Sentencing Memorandum ("Def.'s Initial Mem.").  The
government does not contest these revised restitution figures.

                                1

figure of over $400,000 is consistent with the evidence at trial from defendant's own ledger and from the IRS analysis of defendant's nominee bank accounts.  The other specific offense characteristics — to some of which defendant raises no objection, but yet omits from his guideline calculations — are also clearly appropriate.

The government's sentence is not only appropriate under the guidelines, but it is also necessary to reflect a proper weighing of the 18 U.S.C. § 3553(a) factors.  None of the factors to which defendant points in his sentencing position warrant any significant departure or variance.  Defendant is not the victim of any <u>unwarranted</u> sentencing disparity because of all of the aggravating factors present in his own criminal behavior.  Nor do any of the supposed mitigating factors to which he points distinguish him from the majority of other defendants, many of whom are much more sympathetic.

The restitution requested by the government is also appropriate here.  It is unacceptable to state that the victims of defendant's crimes must collect funds wrongfully taken by defendant through separate administrative proceedings when defendant's guilt has already been proven beyond a reasonable doubt.  Indeed, it is <u>mandatory</u> that the court order restitution to OWCP, and the Court should, for the same policy reasons, also make the IRS whole for defendant's non-Title 18 crimes.

## II.  **ARGUMENT**

### A.  **Guidelines Enhancements**

The correct total offense level under the guidelines is 40, not 28, as urged by the defendant.  Defendant erroneously argues

that his crimes do not merit enhancements for the full amount of

the loss proven at trial; the fact that as an immigration

prosecutor, defendant held a "high-level decision-making or

sensitive position"; and the fact that he was an organizer and

leader of a sophisticated and lengthy scheme and involved five or

more participants. (Def.'s Initial Mem. at 4-6.) With no

analysis at all, defendant apparently also omits from his

sentencing calculation either the enhancement that applies to him

for taking more than one bribe, U.S.S.G. § 2C1.1(b)(1), or the

enhancement that applies to public officials who facilitate the

obtaining of documents relating to naturalization, citizenship,

legal entry, or legal resident status, U.S.S.G. § 2C1.1(b)(4).

(Def.'s Reply at 3.[2])  The Court should reject each of

defendant's arguments because these enhancements, each of which

reflect the Sentencing Commission's concern about an important

aggravating factor, apply to defendant's crimes.

      1.   <u>High-Level Decision Making or Sensitive Position</u>

Section 2C1.1(b)(3) of the Sentencing Guidelines requires a

four-level increase if "the offense involved an elected public

official or any public official in a high-level decision-making

or sensitive position." U.S.S.G. § 2C1.1(b)(3).  Application

note 4 states that "high-level decision-making or sensitive

position" means a position characterized by a direct authority to

---

      [2]   Defendant states in his reply brief that the total specific offense characteristics should equal 14.  (Def.'s Reply at 6.)  Because defendant does not state how he gets to this number, the government assumes that, in addition to those enhancements about which defendant <u>did</u> raise an objection, defendant also omitted either the enhancement for multiple bribes or the enhancement applicable to public officials who assist in procuring immigration documents.

make a decision for, or on behalf of, a government department,
agency, or other government entity, or by a substantial influence
over the decision-making process.  U.S.S.G. § 2C1.1, App. Note
4(A).  The note also explicitly lists "a prosecuting attorney
. . . and any other public official with a similar level of
authority" as an example of a high-level decision-making
position.  U.S.S.G. § 2C1.1, App. Note 4(B).

Defendant's position as an Assistant Chief Counsel ("ACC")
for Immigration and Customs Enforcement ("ICE") was directly
analogous to this example specifically mentioned in the
application notes.  Defendant was responsible for prosecuting
immigration proceedings before federal immigration judges in
immigration court.  In that capacity, defendant made
recommendations to the court, questioned witnesses, cross-
examined alien respondents and made determinations on how to
proceed during removal/deportation proceedings.  Defendant even
served as the liaison officer between his office and the Federal
Bureau of Investigation during his tenure as an ICE ACC.  A clear
example of defendant's authority to act autonomously and to
influence the government decision-making process is defendant's
successful motion to dismiss alien B.G.P.'s removal proceedings.
In that case, not only did defendant seek to dismiss the removal
proceedings, but defendant had sufficient autonomy and discretion
to stand up in court and request a dismissal with prejudice and a
waiver of any future government appeal.

The fact that defendant held such a position is evident from
the trial record.  Immigration Judge Tara Naselow-Nahas,
defendant's former supervisor at the Office of Chief Counsel,

testified that defendant "prosecuted" immigration matters in immigration court.  Defendant also identified himself as a prosecutor in income tax filings with the IRS and in a resume that he submitted to the Office of Worker's Compensation a few weeks before his arrest.  (Tr. Ex. 465.)

Accordingly, the Court should apply the four-level enhancement applicable under U.S.S.G. § 2C1.1, and reject defendant's arguments to the contrary.  Notably, defendant does not even address the examples in the application notes and cites only one case, United States v. Stephenson, 895 F.2d 867 (2d Cir. 1990), which specifically distinguishes an export officer from a "prosecuting attorney."  895 F.2d at 877-78.  Here, there is no meaningful distinction between defendant's role and that of a "prosecuting attorney," and defendant makes no attempt to draw one.  Defendant's arguments that he was not an elected official and that 90 other attorneys in the district shared his position do not distinguish him.  (Def.'s Initial Mem. at 5.)  His statements that he was "not a decision maker," "not in a sensitive position," and "merely carried out the guidelines set for all such lawyers by ICE" (id.), are belied by the facts of the case, which show how defendant used and abused his position to steal confidential original immigration files and to appear in court on behalf of the government to dismiss cases and waive appeal for the benefit of the bribe-payers, and without the authorization or knowledge of his supervisors.

### 2.   Organizer/Leader Role in the Offense

Under U.S.S.G. § 3B1.1, a defendant's base offense level is raised by four levels if he "was an organizer or leader of

criminal activity that involved five or more participants or was otherwise extensive."  In applying the enhancement, courts should consider

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, app. note 4.  The guidelines also make clear that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  Id.

The government submits that the four-level enhancement clearly applies to defendant because defendant was the mastermind of the criminal conspiracy that involved him, his wife, other alien recruiters including his former housekeeper Yolanda, and over sixty aliens who paid him to submit false documents, obstruct justice, or otherwise intervene on their behalf.  This is clear from the evidence here, which shows that defendant was involved in every aspect of the scheme, except for some Spanish-language communications with the aliens; he was the public official central to the bribery part of the scheme, and the only one who could use his official position to steal files, appear in court, and otherwise further the fraudulent scheme; he was the one with the knowledge regarding immigration law and procedure to engineer the false document part of the scheme; he was the one who kept detailed records of payments from aliens, including the ledgers found on his computer (Tr. Exs. 34, 35 & 38); and he was the one who answered critical questions for and gave directions

to the aliens, either directly by email and during in-person
meetings, or through his wife.  See, e.g., United States v.
Alfonso-Reyes, 592 F.3d 280, 295-96 (1st Cir. 2010) (enhancement
applied to defendant who helped inflate co-conspirators' damages,
and instructed them to obtain falsified estimates or falsify loan
applications); United States v. Kelley, 36 F.3d 1118, 1129 (D.C.
Cir. 1994) (enhancement applied to defendant who devised details
of bribery schemes, instructed and coerced others to assist him,
used most of the money for his own benefit, and instructed others
how to fill out forms and where to send checks).

It is notable that defendant does not argue that he did not
play this leadership role, but merely that his wife's role was
equal to his.  (See Def.'s Initial Mem. at 5-6; Def.'s Mot to
Recuse at 6.)  Even if this were true, it does not exempt
defendant from the four-level role enhancement.  U.S.S.G.
§ 3B1.1, app. n. 4.  Moreover, the government submits that the
evidence at trial showed that defendant did supervise his wife
and co-conspirator, because the evidence showed that defendant —
not his wife — was the mastermind of the scheme and was directing
her in her communications with various aliens.  It was defendant
— not his wife — who had the knowledge to use shell corporations,
who knew what educational categories and other responses to list
on false applications, who knew what to do in Immigration Court
to get an removal petition dismissed with prejudice.  Defendant
used his wife to pass along instructions to the aliens in
Spanish, which she spoke, and which he did not.

Defendant's command of the scheme and the fact that he
passed along instructions to his wife is clear from the evidence.

Several of the aliens testified that they would ask M. Kallas questions in Spanish, but that she would not know the answers and would have to get the information from defendant — or, as he was known to many of the aliens, "the Judge."  Alien M.E.V.A. also testified that, when she told M. Kallas that she could not pay more money before her interview with CIS, defendant began yelling in the background, and then his wife began yelling at M.E.V.A. The casino videotape — which defendant erroneously argues "is a good example of the two [co-defendants] working together, equal in their roles" (Def.'s Mot. to Recuse at 6) — in fact shows defendant leading the meeting with alien M.E.S.; defendant directing M. Kallas to approach the table; and M. Kallas asking <u>defendant</u> what corporation they would use as M.E.S.'s sponsor.

The evidence also shows that defendant was an organizer and leader of the alien bribe payers.  His own ledgers show that defendant kept careful records for each of the aliens, including amounts paid by them, false applications submitted on their behalf, and other stages of the process.  As stated above, there was also substantial evidence that, through M. Kallas, defendant would pass along instructions to the aliens.  Defendant's own emails also show that he directly instructed some aliens on how to fill out various forms, where to send payment, etc.  Alien C.C.C. also testified that she received instructions directly from defendant via email.

Because defendant was clearly an organizer and leader vis-a-vis both his wife and the alien bribe payers, the Court should apply the four-level upward adjustment for his role in the offense.

1                    3.   Value of payments received

2        Section 2C1.1(b)(2) of the Sentencing Guideline instructs

3   the Court to increase defendant's offense level pursuant to the

4   loss table in Section 2B1.1 for the "the value of the payment,

5   the benefit received . . . ."  U.S.S.G. § 2C1.1(b)(2).  The

6   Probation Office recommends a fourteen-level increase pursuant to

7   Section 2B1.1(b)(1)(H), finding that defendant received or

8   solicited funds exceeding $400,000, but less than $1,000,000.00

9   (PSR ¶ 64).  This finding is consistent with the evidence adduced

10  against this defendant at trial.

11       Ledgers found at defendant's residence and analysis of bank

12  records both place the amount of payments received by defendant

13  over $400,000.  Defendant himself acknowledged that he used these

14  ledgers to track payments from aliens in his recorded

15  conversations with M.E.S., referring to a "program" that kept a

16  record of how much M.E.S. paid, and telling M.E.S. that he had

17  received $9,500 plus an additional $1,000 from M.E.S., which is

18  exactly what was stated in one of defendant's ledgers.  (Tr.

19  Ex. 34.)  Furthermore, as outlined in government's Trial

20  Exhibit 483, bank records clearly establish that after excluding

21  defendant's salary and worker's compensation payments, defendant

22  and M. Kallas deposited and caused to be deposited $425,854.01

23  for the years 2004 through 2007 in bank accounts controlled by

24  defendants.  Not only does this over $400,000 figure have a

25  basis, it is arguably even a conservative estimate because it

26  does not account for either the $20,000 accepted by defendant at

27  the casino on June 26, 2008 or the $177,500 of cash found at

28  defendant's residence.  It is also conservative because this loss

                                    9

or value figure does not account for, and the government is not seeking an upward departure based upon, the systemic and pervasive corruption of the employment-based work permit program or the loss in public confidence in ICE, CIS, and DOL that may result from defendant's conduct.  See U.S.S.G. § 2C1.1, app. n. 7 (stating that such conduct may warrant an upward departure). Nevertheless, such damage should be considered by this Court when it fashions defendant's sentence, and justifies the government's recommended midpoint sentence.

Defendant does not address this evidence, but instead argues that he should somehow receive the benefit of the bargain that his wife struck with government by pleading guilty pursuant to a plea bargain several months before any evidence was presented at trial.  There is no basis for such an argument.  The evidence at trial as to this defendant clearly established that the appropriate value of payments that he received was over $400,000.

### 4.   More Than One Bribe

U.S.S.G. § 2C1.1(b)(1) provides for a two-level enhancement "[i]f the offense involved more than one bribe . . . ."  U.S.S.G. § 2C1.1(b)(1).  Defendant was convicted at trial of six separate bribery counts setting forth six different bribes.  Moreover, defendant's own ledgers show payments from dozens more aliens. Accordingly, there can be no question that this two-level enhancement applies here.

### 5.   Defendant Facilitated Obtaining Documents Relating to Immigration Status

Section 2C1.1(b)(4) provides for a two-level increase "[i]f the defendant was a public official who facilitated . . . the

obtaining of a passport or a document relating to naturalization, citizenship, legal entry, or legal resident status."  U.S.S.G § 2C1.1.(b)(4)(B).  This enhancement clearly applies to defendant's crimes.

Defendant told alien M.E.S. "I guarantee your resident card 100 percent," as defendant accepted a $20,000 bribe from him on June 26, 2008.  If this did not indicate the applicability of the enhancement in defendant's own words, the Court need only look at the point of all of the other bribes that defendant was taking. Defendant's bribery scheme was based on promises that he would use his position as an immigration official to get the aliens immigration documents to work in the United States and eventually become permanent residents.  (See also PSR ¶ 67.)  That is what each of the testifying aliens told the jury that defendant promised him, and that is what defendant attempted to obtain by filing false applications for work certifications, work permits, and green cards, with the Department of Labor ("DOL") and United States Citizenship and Immigration Services ("CIS").

6.   Grouping

Defendant apparently misunderstands the probation office's grouping calculations and erroneously assumes that offense-level points were added to defendant's total offense level based upon the multiple counts of conviction.  This is not the case. Counts 1-7 each carry a total offense level of 40.  (See PSR ¶¶ 62-71.)  The government agrees with this calculation, as well as the PSR's calculation that no additional offense levels should be added under the multiple count rules set forth in U.S.S.G. §§ 3D1.2 and 3D1.3.  As stated in greater detail in the

11

1   government's initial sentencing memorandum, the Court should add

2   a two-year mandatory consecutive sentence for the 18 U.S.C.

3   § 1028A violations, and it should take into account all of

4   defendant's criminal conduct in sentencing defendant at the

5   midpoint, not the low-end of the guidelines range. (See Govt's

6   Initial Sentencing Mem. at 18-19, 22, 25.)  Such a result is

7   explicitly contemplated in the guidelines and is appropriate here

8   to account for the wide variety of criminal activity by this

9   defendant.  See U.S.S.G. § 3D1.3, app. note 4; U.S.S.G. § 3D1.4,

10  background note.  Indeed, it would be manifestly unfair to treat

11  this defendant the same as one who had not also lied to DOL and

12  CIS by submitting countless false documents; committed

13  obstruction of justice, tax evasion, and workers compensation

14  fraud; and thereby defrauded four separate public agencies — DOL,

15  CIS, OWCP, and the IRS — and damaged public confidence not only

16  in his own agency, but also CIS and DOL.

17      **B.    Defendant's Arguments For Downward Departure/Variance**

18      The government maintains that the appropriate sentence is

19  353 months imprisonment, which corresponds to a sentence at the

20  midpoint of the guideline range, plus the 24-month mandatory

21  consecutive sentence required for defendant's violations of 18

22  U.S.C. § 1028A.  Defendant's arguments for "downward departures"

23  do not suggest a contrary result.

24          1.    The Government's Recommended Sentence Does Not
                  Create Any *Unwarranted* Disparity
25

26      The Court should reject defendant's arguments that a

27  downward departure is warranted because the government's

28  recommended sentence is disparate from that recommended by the

12

1  Probation Office for defendant's wife or that in selected other
2  cases, some of which do not even involve a public official or a
3  bribery count.  Section 3553(a)(6) does not direct courts to
4  consider all disparities in sentencing, but only "unwarranted
5  sentencing disparities."  18 U.S.C. § 3553(a)(6) (emphasis
6  added); cf. also United States v. Tzoc-Sierra, 387 F.3d 978, 981
7  (9th Cir. 2004) (stating that downward departure was appropriate
8  where co-defendants were "convicted of the same offense as the
9  defendant" and where there was "no indication that Tzoc-Sierra is
10 any more culpable than the other defendants" (citation and
11 internal quotation marks omitted)).

12      Despite the fact that the parties have briefed this issue in
13 the context of defendant's motion to recuse the probation
14 officer, defendant again fails to spend any time analyzing why
15 the recommended sentence — which is within the guideline range —
16 creates any unwarranted disparity with either his co-defendant or
17 with the defendants in the cases that he cites.  He also ignores
18 the fact that the Ninth Circuit clarified that the intent of
19 § 3553(a)(6) was to promote "national uniformity in sentencing
20 rather than uniformity among co-defendants in the same case,"
21 United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007)
22 (emphasis added), that a court following the guidelines can
23 reasonably expect to achieve the national uniformity that
24 Congress intended, and that a Court must consider a specific
25 defendant's crimes and role in those crimes when addressing
26 whether disparities are unwarranted, see, e.g., id. at 1142.
27 Indeed, defendant engages in no analysis whatsoever, but merely
28 points to his wife's sentence recommendation and four other

cherry-picked sentences and states that they are lower.  Indeed, with regard to his wife, defendant even put the two recommendations in graphical form, as if this somehow addresses any of the obvious differences between defendant and his wife. (Compare, e.g., Def's. Sentencing Mem., Ex. C. with Govt's Opp'n to Def.'s Mot. to Recuse at 5-8.)

The Court should reject defendant's conclusory arguments. Neither defendant's wife's situation nor that of the defendants in the cases that defendant cites are analogous to defendant's own, and they do not warrant any downward departure or variance in defendant's sentence.  As previously discussed above, in the government's initial sentencing memorandum, and in the government's opposition to defendant's motion to recuse, each and every sentencing enhancement that gets defendant to a total offense level of 40 is warranted under the guidelines, and each of these enhancements reflect an important policy reason to distinguish between crimes and particular defendants' roles in them.  Similarly, each is an important factor in the nature and the circumstances of defendant's offenses, which warrant consideration under 18 U.S.C. § 3553(a).

Defendant and his wife, for example, are very differently situated with regard to their role in the offense.  The Court should not ignore, as defendant does, that it is defendant who is the public official and attorney who violated the duties of his office and of his profession.  Public officials and those with specialized training, should be punished more harshly than their non-government co-conspirators.  See, e.g., U.S.S.G. § 2C1.1(a); U.S.S.G. § 2C1.1(b)(4).  This is particularly true regarding a

14

crime like this one, where defendant, a public official and immigration prosecutor, enabled people to evade immigration requirements and remain in the country unlawfully.  Id.  The government also submits, for all of the reasons discussed above, that defendant masterminded the criminal scheme here, using his training, knowledge, and government position, and thus should be punished more harshly as an organizer and leader of the conspiracy.

Defendant also ignores the fact that M. Kallas pleaded guilty and accepted responsibility in November 2009, several months prior to trial, and pursuant to a plea agreement under which she received a number of benefits.  First, by accepting responsibility, M. Kallas received a three-level reduction pursuant to U.S.S.G. § 3E1.1.  M. Kallas also pleaded guilty to a plea agreement under which the government agreed, if M. Kallas accepts responsibility and complies with her plea agreement, to dismiss all of the 18 U.S.C. § 1028A counts at the time of sentencing.  This is a major benefit affecting M. Kallas's sentence, because each of the § 1028A counts carries a mandatory two-year sentence which must run consecutively to any term of imprisonment imposed for the other counts.  M. Kallas also received a number of other benefits under the plea agreement, including the government's agreement to stipulate that she played a minor role in the offense and that the loss amount attributable to the bribery scheme was at least $200,000, instead of the over $400,000 that was later proved as to defendant C. Kallas at trial.  Defendant, on the other hand, not only failed to accept responsibility, but to this day shows absolutely no comprehension

15

of the seriousness of his crimes, even likening his conduct to those who operated safe houses on the Underground Railroad. (<u>See</u> Report of Dr. Carole Morgan ("Morgan Report") at 10.) There are therefore a number of reasons why defendant M. Kallas's total offense level, and thus her sentencing range, should be lower than defendant's.

To the extent that any unwarranted disparity exists between defendant and his wife, it is because M. Kallas's recommended sentence is too low. The government does not agree with the seven-level downward variance that the probation office recommended for M. Kallas because she has already received substantial benefits under her plea agreement that are sufficient to account for any mitigating circumstances that may exist.

Each of the four other sentences that defendant cherry-picked are also readily distinguishable.[3] <u>United States v. Sustaire</u> involved a defendant who signed a plea agreement with the government in which he pleaded to one conspiracy and one substantive bribery count, and who testified at trial against his co-defendant. (<u>See</u> Declaration of Raymond O. Aghaian ("Aghaian Decl."), Ex. A (Docket No. 71 and Caption).) <u>See also</u> <u>United States v. Lee</u>, No. 00-10360, D.C. No. CR-98-20117-RMW, Fed. Appx.

---

[3]  The government's ability to distinguish the cases that defendant cites are somewhat limited by his improper citation of what appear to be unpublished dispositions, as well as his failure to attach any sentencing transcripts, memoranda, or orders as exhibits, and in some cases, use of the wrong case number (<u>Sustaire</u>) or a case number with no associated entry on the PACER database system (<u>Chavez</u> and <u>Bailey</u>). (<u>See</u> Def.'s Initial Mem. at 8-9; <u>see also</u> Addendum to the Presentence Report, disclosed on August 2, 2010 ("PSR Addendum") ¶ 5 (noting difficulty properly analyzing the facts of the cited cases).)

744, 2001 WL 1297698 (9th Cir. Oct. 23, 2001) (unpublished).
Notably, the co-defendant, a bribe-payer who was not a public
official, was ultimately sentenced to 30 months on two counts.
(Aghaian Decl., Ex. A (Docket No. 105).)  Presumably, Sustaire
would have received a much greater sentence had he not
cooperated, given that he was a public official and accepted
bribes from other people.  It is also notable that this case did
not involve the aggravated identity theft, workers compensation
fraud, and tax evasion that are present in this case.  The
defendant in United States v. Chavez also pleaded guilty, and the
case did not appear to involve aggravated identity theft, workers
compensation, or tax evasion charges.  (Def.'s Initial Mem. at
8-9.)  The United States v. Bailey, also involved a plea to much
more limited charges than those at issue here.  (Id.)

    As noted in the PSR Addendum, United States v. Alonso-Prieto
is distinguishable because it did not involve a public official,
bribery, or any of the other crimes at issue here, except for
aggravated identity theft! (See PSR Addendum ¶ 6.)  It did,
however, involve a much smaller loss figure and a high-end
guidelines sentence.  (Id.)  It is notable that this district
court determined that that defendant's conduct — which involved
fewer losses, a shorter period of criminal activity, much less
wide-ranging criminal activity, and which did not involve the
abuse of the public trust by a public official and skilled
professional — warranted a high-end guidelines sentence.  Given
the differences in the cases, the government's recommended
sentence for this defendant is arguably more lenient under the
circumstances than was Alonso-Prieto's.

17

1    The cases cited in defendant's reply brief also appear to be
2    cherry-picked and readily distinguishable.  First of all, the
3    Court should not even consider them to evaluate whether
4    defendant's sentence is appropriate, because they all involve
5    very different crimes and very different facts.  E.g., Tzoc-
6    Sierra, 387 F.3d at 981 (stating that downward departure can be
7    considered where co-defendants were convicted of the same offense
8    as the defendant).  United States v. Melbourne, No. 02-30238,
9    Fed. Appx. 938, 2003 WL 1506050 (9th Cir. Mar. 10, 2003)
10   (unpublished), involved a plea to a plea agreement and a sentence
11   near the high-end of the applicable guideline range.  (See
12   Aghaian Decl., Ex. B (Docket Nos. 14, 19).)  The defendant in
13   United States v. Ferrara, 384 F. Supp. 2d 384, 388 (D. Mass 2005)
14   had a guideline range of life, but his plea agreement provided
15   for a substantial downward departure to a 22-year sentence.  The
16   United States v. Irons case, No. 01-30447, 65 Fed. Appx. 110,
17   2003 WL 1919379 (9th Cir. April 18, 2003) (unpublished), involved
18   a very unusual fact pattern in which the defendant claimed not to
19   remember the crime, assisted the police in investigating it by
20   making a statement and providing them with full access to all
21   evidence, and received a six-level downward departure for
22   aberrant behavior as a result.  Id.; see also United States v.
23   Irons, Nos. 99-30375, 00-30014, 13 Fed. Appx. 630, 2001 WL 760533
24   (9th Cir. Jul. 5, 2001) (unpublished).

25        2.   Defendant Should Not Receive a *Lesser* Sentence
               Because He Committed Felonies While Employed as a
26             Government Prosecutor

27        Defendant argues that he is vulnerable to victimization in
28   prison as a former government attorney particularly if housed

18

among illegal immigrants whom he was responsible for deporting. In support of his contention, defendant cites to United States v. Koon, 518 U.S. 81 (1996).  In Koon, the Supreme Court held that the sentencing court may consider a factor for departure if the Guidelines have not proscribed such factor and, based on the particular case, whether the factor "takes the case outside the heartland."  Id. at 109.  The Court found that in that unusual case — the defendants were the officers convicted of assaulting Rodney King, and prior acquittal on state charges had prompted nationwide rioting — the Supreme Court held that the district court did not abuse its discretion in considering the defendants' fear of abuse in prison due to their law enforcement positions and notoriety.  Id. at 111-12.  This case is much different, however, and the Court should reject defendant's request for a departure on the same grounds.

Defendant will neither be the first, nor unfortunately the last, public official the United States Bureau of Prisons ("BOP") has and will house in its facilities.  As evident from defendant's incarceration in the last two years in BOP custody, the BOP has the capability to accommodate defendant during the course of his incarceration.  As defendant admitted to Dr. Morgan during an interview on June 25, 2010, for the two years that defendant has been in BOP custody, defendant has spent no more than 39 days total in solitary confinement. (Morgan Report at 11.)  For the remaining twenty-two and half months, defendant has been among the general population without incident.  (See Declaration of Tammi Greer ¶ 4 (filed concurrently under seal).)

19

1     Simply put, defendant is once again attempting to use his

2 position to his advantage.  There is no indication, particularly

3 given defendant's incarceration for the last two years, that

4 defendant's former position as an ACC with ICE will subject

5 defendant to abuse.  Defendant was not responsible for

6 prosecuting any criminal proceedings and was not responsible for

7 putting any of his co-inmates in jail, nor for any civil rights

8 abuses against them.  Indeed, the outcome of the proceedings for

9 which defendant was responsible either led to the removal of the

10 aliens from the United States or grant of legal residency and or

11 naturalization.

12     Moreover, many courts have refused to grant a downward

13 departure based on Koon for alleged susceptibility to abuse in

14 prison.  For instance, the Fifth Circuit upheld a district

15 court's refusal to grant a downward departure based on Koon for

16 susceptibility to abuse in prison for a former new Orleans police

17 officer convicted of robbery.  United States v. Thames, 214 F.3d

18 608, 613-14 (5th Cir. 2000).  The Court distinguished Koon, and

19 stated "a defendant's status as a law enforcement officer is

20 often times more akin to an aggravating, as opposed to a

21 mitigating sentencing factor, as criminal conduct by a police

22 officer constitutes an abuse of a public position." Id. at 614

23 (citation omitted).  That is precisely the case here.  Defendant

24 should not receive a departure for the very reason his actions

25 are so condemnable: that he was a public official responsible for

26 enforcing the immigration laws of the United States.  Defendant,

27 as a public official, abused his position to his benefit by

28 accepting hundreds of thousands in bribes from unsophisticated

aliens.  Defendant, a convicted felon, should not now be allowed
to abuse his former position as an ACC to his benefit and thus
receive a lower sentence.  To allow a departure on the basis that
defendant was a public official would thwart the intent and
purpose of the guidelines.  See United States v. Kapitzke, 130
F.3d 820, 822 (1997) (observing that allowing departure because
child pornographers were susceptible to abuse in prison would
thwart the guidelines' recommendations for such crimes).  The
Sentencing Commission considered the possibility that defendants
convicted of bribery would all be public officials and that some
of these public officials would in fact be officials charged with
enforcement of laws such as defendant.  In doing so, the
Commission applied greater not lesser sentences for such crimes
and such defendants.  See, e.g., U.S.S.G. § 2C1.1(a), (b)(3),
(b)(4), app. note 4(B) (listing prosecutors and law enforcement
officers as examples of those who should receive a guidelines
enhancement).

3.   The Court Should Not Impose a Lesser Sentence As a
     Result of Defendant's Mental or Physical Health

     Defendant also asserts that he should receive a downward
departure for both his mental and physical health.  Sections
5H1.3 and 5H1.4 of the guidelines discourage a downward departure
based on a defendant's physical or mental health condition and
specifically provide that mental, emotional or physical condition
are "not ordinarily relevant" in determining whether a departure
is in fact warranted.  U.S.S.G. §§ 5H1.3 and 5H1.4.  Application
note 3(C) to U.S.S.G. § 5K2.0 specifically provides:

21

> Because certain circumstances are specified in the guidelines as <u>not ordinarily relevant</u> to sentencing (e.g. Chapter Five, Part H (Specific Offender Characteristics)), a departure based on any one of such circumstances should occur only in <u>exceptional cases</u>, and only if the circumstance is present in the case to an <u>exceptional degree</u>.

U.S.S.G. § 5K2.0 app. note 3(C) (emphasis added). Defendant's mental or physical condition is neither an exceptional case nor one occurring to an exceptional degree, and should not be relevant to his sentence.

In support of his contentions regrading his mental and physical health, defendant submits Dr. Carole Morgan's report, which was prepared based on a single three-hour interview of defendant at the Metropolitan Detention Center on June 25, 2010, <u>after</u> defendant interviewed with the Probation Office and the Probation Office recommended a 316-month sentence.

Dr. Morgan's report and evaluation is based almost entirely on defendant's self-serving statements made during the course of the interview. Based on this interview, two years after defendant's arrest and two months after defendant was convicted on thirty-six felony counts that subjected him to a very lengthy prison sentence, Dr. Morgan diagnosed defendant with "suffer[ing] from a depressed mood" — major depressive disorder, obsessive-compulsive disorder, and post traumatic stress disorder. (Morgan Report at 12.) Dr. Morgan also states in her report that defendant demonstrated "poor judgement."

Nowhere in Dr. Morgan's report does it provide that defendant's self-reported depression, or obsessive compulsive disorder caused defendant to accept bribes from aliens, to steal A-files from the Office of Chief Counsel, and to lie to a federal

22

judge, as government counsel, in an effort to dismiss removal
proceedings.  To the contrary, similar to most convicted felons,
the report provides that defendant suffers from "poor judgment,"
that defendant's "thought processes don't evidence psychosis,"
and that there was "no evidence of hallucinations or delusions."
(Morgan Report at 1, 2, 15.)

Moreover as the report provides, at least one of the three
conditions that Dr. Morgan diagnosed defendant with developed
after defendant's arrest and thus have nothing to do with
defendant's actions prior to that time.  As for the remaining two
diagnoses, the report neither attributes nor accounts for the
effect of defendant's arrest, incarceration for the past two
years, and guilty verdicts in April 2010 when diagnosing
defendant with depression and obsessive compulsive disorder.
While the report attempts to paint a gloomy picture of
defendant's childhood and upbringing, stating that defendant did
not spend adequate time with his parents, defendant made the
opposite statements to the Probation Office.  (Morgan Report at
5.)  For example, during a pre-sentence interview with the
Probation Office on May 20, 2010, defendant stated that his
parents were "great," that "[t]he family did a lot of things
together, such as visiting [defendant's] grandmother in North
Dakota each summer."  (PSR ¶ 124.)  The report dismisses these
remarks, and also both demonizes and diagnoses defendant's wife,
M. Kallas, even though M. Kallas was not interviewed and her
medical records were not reviewed.  (Morgan Report at 7-10.)
This report is therefore suspect and, even taken in best light,

23

does not and cannot excuse or justify defendant's egregious conduct as a government lawyer.

Further, as the recommendation letter by the Probation Office provides, "BOP can monitor and treat most medical problems.  Although medical services are provided in all institutions, seriously ill inmates may be hospitalized at a BOP-administered Medical Referral Center."  (Rec. Ltr. at 5.) Defendant's physical condition is not so extraordinary as to fall outside the BOP's ability to provide appropriate medical care. (Id.)  Furthermore, based on the under seal Declarations of Nicole Knight, Performance Improvement/Infectious Disease Control Coordinator for the MDC, and Samantha Shelton, MDC Psychology Treatment Programs Coordinator, which are concurrently filed herewith, it appears that defendant has in fact received adequate treatment for both physical and mental health during the time of his incarceration.

4.   Defendant's Family Situation Does Not Warrant a More Lenient Sentence

Unlike many defendants appearing before this Court, defendant "had a good upbringing" and "[b]y all accounts, [defendant] had it all – he was educated at top schools, he had a stable government job, he had a wife and two children, and he had a home in the suburbs."  (Rec. Ltr. at 4-5.)

Defendant made a calculated choice to mastermind and partake in the vast criminal enterprise spanning over the course of five years.  Defendant also chose to employ his wife, the mother of his children, as a co-conspirator in the scheme.  Defendant made the conscientious choice to risk it all.  Defendant's punishment

must be measured by the choices he has made as an adult rather than the losses he will incur as a result of his crimes. Defendant should not be rewarded with a lesser sentence for the "unbalanced family" situation that he created by committing crimes with his wife that — if caught — would take them away from their children. Moreover, based on the Probation Office's guideline calculations for M. Kallas, as well as her plea agreement with the government, it is M. Kallas, who was not a public official and not the mastermind of the scheme, who will serve less time in prison and who is the parent best situated for an earlier reunion with the Kallas children. As the public official who employed his wife as a co-conspirator, defendant should not now receive such a benefit.

     **C.**   **Restitution and Fine**

Defendant's suggestion that restitution is unnecessary in this case because the victims of his crime can collect through additional administrative proceedings is not well taken. There is no dispute that these amounts are owed, and the Court should order defendant to make these victims whole as part of these judicial proceedings. Indeed, restitution for OWCP is mandatory under 18 U.S.C. § 3663A. The Court should order restitution to OWCP as required by law, and should also order restitution to the IRS for the same policy reasons. See, e.g., United States v. Bok, 156 F.3d 157, 166-167 (2d Cir. 1998); U.S.S.G. § 5E1.1(a)(2).

With regard to defendant's ability to pay more than nominal restitution payments and a guidelines fine, the government notes that even in the new information submitted in defendant's reply,

defendant does not account for the proceeds of his crimes, or explain why he cannot cash out his retirement accounts and sell the Cadillac SUV to pay his obligations.

     **D.**   **Request for a Closed Hearing**

Defendant also requests that the sentencing hearing in this case be closed to the public to protect him from media reports about the case.  (Def.'s Initial Mem. at 14.)  Because defendant can suggest no particularized concern regarding his safety, his request is tantamount to a suggestion that proceedings in any bribery case should be closed.  Moreover, representatives of the agencies victimized by defendant's crimes may want to appear at the sentencing and should be permitted to do so.  The Court should reject defendant's request, hold open the sentencing just as the trial of this case was held open to the public, and thereby protect society's interest in open proceedings.  See, e.g., 28 C.F.R. § 50.9 (noting the "vital public interest in open judicial proceedings").

**III. CONCLUSION**

For the foregoing reasons and those set forth in its initial sentencing memorandum, the government maintains that this Court sentence defendant at the midpoint of the guidelines range, to a total of 353 months imprisonment; a two-year term of supervised release; a mandatory special assessment of $3,600; and a $25,000 low-end guidelines fine.  The government further recommends that the Court order defendant to pay restitution to OWCP in the amount of $296,865.45, and that the Court oblige defendant, as a

//

//

condition of defendant's supervised release, to pay an additional

$83,424 in restitution to the IRS.

DATED: August 3, 2010          Respectfully submitted,

                               ANDRÉ BIROTTE JR.
                               United States Attorney

                               ROBERT E. DUGDALE
                               Assistant United States Attorney
                               Chief, Criminal Division


                               __/s/_____
                               RAYMOND O. AGHAIAN
                               Assistant United States Attorney

                               Attorneys for Plaintiff
                               United States of America